

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

LTG

*610 Federal Plaza*
*Central Islip, New York 11722*

November 19, 2021

**FILED UNDER SEAL**
<u>By E-mail</u>

The Honorable Joan M. Azrack
United States District Judge
United States District Court
Eastern District of New York
100 Federal Plaza
Central Islip, NY 11722

> Re: United States v. James Hickey
> <u>Criminal Docket No. 16-0017 (JMA)</u>

Dear Judge Azrack:

      The government submits this letter in connection with the sentencing of the defendant James Hickey, which is scheduled for January 20, 2022 at 11:00 a.m. By this letter the government moves pursuant to Section 5K1.1 of the United States Sentencing Guidelines (the "Guidelines"), and Title 18, United States Code, Section 3553, to permit the Court, in its discretion, to impose a sentence below the advisory Guidelines range for Mr. Hickey. As set forth in more detail below, Mr. Hickey provided substantial assistance to the government which may only be described as extraordinary, thus, the government urges the Court to strongly consider this cooperation when fashioning the appropriate sentence.

<u>BACKGROUND</u>

      On December 14, 2012, a man named Christopher Loeb was arrested and charged with burglarizing motor vehicles, including a motor vehicle issued to and possessed by the then Chief of the Suffolk County Police Department ("SCPD") James Burke. Thereafter, Loeb was transported to the Fourth Precinct of the SCPD, placed inside of an interview room and handcuffed to a chain affixed to the floor of the room. Later that day, Burke, and other members of the SCPD, entered the interview room and assaulted Loeb, prompting a coerced confession to the car burglaries.

      Shortly after the incident, Burke admitted to his friends - the then District Attorney of Suffolk County, Thomas Spota, the then Chief of the Government Corruption Bureau of the Suffolk County District Attorney's Office ("SCDAO") Christopher McPartland, the then Commanding Officer of the Criminal Intelligence Unit (the "Intel Unit") Lieutenant

James Hickey, and others - that he committed the assault.  As the evidence proved at trial, after the assault and until the dates of their arrests, Spota, McPartland, Hickey, Detective Anthony Leto, Detective Kenneth Bombace and other members of the SCPD agreed to conceal Burke's role in the assault and to obstruct and attempt to obstruct the federal investigation of that assault.  In other words, the coconspirators agreed to take whatever action necessary to protect Burke, and throughout a lengthy period, engaged in actions and deeds to further those ends, including but not limited to tampering with witnesses, suborning, and committing perjury, and obstructing justice.

The coconspirators met regularly began in January 2013.  Indeed, in the ensuing months, the coconspirators, including Spota, McPartland, Burke, Hickey, SCPD Chief of Detectives William Madigan and other members of the SCPD, held multiple meetings and participated in hundreds of telephone calls,.  During at least two of the meetings, Hickey and Burke, at McPartland's direction, fashioned and honed a false narrative of the events of December 14, 2012, a narrative that the three later adopted, and insisted others adopt, namely, that Burke "may have popped his head into the interrogation room" while Loeb was being interrogated, but that Burke did not enter the room, and that no one assaulted Loeb.

Then, on June 25, 2013, FBI agents served members of the SCPD with federal grand jury subpoenas in furtherance of the grand jury investigation of the assault.  In response, Burke ordered Hickey to drop all police work and focus entirely on ensuring the silence of Bombace, Leto and the other detectives working for Hickey in the Intel Unit.  Burke made it known that any cooperation with the federal authorities or failure to abide by the false narrative would result in severe consequences.  Indeed, Hickey was regularly pressured, questioned and ultimately threatened by Spota, McPartland, and Burke to ensure that the Intel Unit detectives continued to propagate the false narrative and refuse to cooperate with the federal investigation.  The threats and relentless pressure from such powerful and vindictive people weighed heavily on Hickey, thus he resorted to the excessive consumption of alcohol in the summer of 2013, leading to his hospitalization from August 24, 2013 until August 29, 2013.  While Hickey ceased drinking after the hospitalization, nothing else changed.  The intolerable pressure never abated, as Spota, McPartland and Burke continued to plague Hickey and demand his constant vigilance.

Then, in December 2013, due to the successful obstructive actions of the coconspirators, the FBI closed its investigation and the grand jury investigation fell dormant.  However, in early 2015, the grand jury investigation was revived and began to gain significant traction.

To that end, in May 2015, the government contacted Bombace's attorney and advised him that Bombace would be called before the grand jury.  On June 3, 2015, after Bombace met with his attorney to discuss the anticipated subpoena, he contacted Hickey to advise him of this new development.  Immediately after talking to Bombace, Hickey phoned Burke to pass along the bad news.  Burke responded by demanding that Hickey "pay a visit" to Leto to make sure Leto was still "tight" and to "take [Leto's] temperature," in other words Burke ordered Hickey to suss out if Leto was cooperating.  Finally, Burke insisted that Hickey meet him that evening in the parking lot of St. Patrick's Church in Smithtown, New York ("St.

Pat's"). As directed, Hickey went to St. Pat's that evening. During that meeting, Hickey briefed Burke about the specifics of his conversation with Bombace, which revealed that, contrary to what they believed, the federal investigation of the Loeb assault was ongoing.

The next day, June 4, 2015, Spota, McPartland, Burke and Hickey met in Spota's office to discuss status of the federal grand jury investigation. During that meeting, Burke directed Hickey to repeat in detail what Bombace told Hickey that Bombace had learned from his attorney. After hearing from Hickey, Spota became enraged and told Hickey that it was not possible that the investigation had been reopened. Burke agreed, insisting that his attorney, Joseph Conway, would have known if the investigation were ongoing, and would have told him. Then McPartland informed the group that he believed Bombace was a "rat," prompting Spota to tell Hickey that, if Bombace was a "rat," Hickey had better find out fast. Spota then declared, "Bombace wants to be a politician, that will never happen as long as I'm here. If he talks, he'll never work in this county again, I'll see to it."

Then, McPartland directed Hickey to "take his guys' temperature" and confront them one-on-one to determine if any of them was a "rat." McPartland further instructed Hickey to give the detectives the full "Hickey treatment," in order to determine if they were "ratting." Spota reiterated that Hickey needed to "get his guys in order." Burke then told Hickey to remind his "guys" what happens to people who "go against the administration," to which McPartland added, "just ask John Oliva."

At the end of the meeting, Spota said, "these guys can't change their stories now because they are locked in, they testified." Spota concluded by telling Hickey, "if Bombace or any of his guys 'flips' they're dead and they will never work in Suffolk County again, I'll see to it." Then, immediately after Burke and Hickey exited Spota's office, Burke threatened Hickey, declaring that he would reveal Hickey's extra-marital affairs if Hickey didn't "get control of the situation."

These threats, coupled with Hickey's long-standing, critical and arguably mandatory role in the conspiracy, took a very heavy toll on him both physically and emotionally. Indeed, the excruciating and unrelenting pressure resulted in a break down, necessitating his hospitalization from October 22, 2015 to October 26, 2015. During the hospitalization, Hickey was diagnosed with an altered mental state brought on by severe sleep deprivation and stress. Unquestionably, the stress was caused by Hickey's acute understanding that the conspiracy he was expected to keep a lid on was unravelling, and the knowledge of what that meant for him. Indeed, Hickey knew Bombace and Leto were under subpoena and cooperating with the federal investigation. Truly, Hickey not fault them for their choices, he just feared the repercussions for all of them.

Then, on October 27, 2015, the County Executive forced Burke to retire and, three days later, on October 30, 2015, Hickey was served with a federal grand jury subpoena. After being served with the subpoena, Hickey met with and hired an attorney in mid-November, insisting that he wanted to cooperate with the investigation. Thus, within days of being retained, Hickey's attorney advised the government of Hickey's desire to cooperate.

Thereafter, on December 4, 2015, Hickey met with the government for the first of many, many, long, productive, and enlightening meetings. Ultimately, on January 15, 2016, Hickey pled, pursuant to a Cooperation Agreement, to a one-count information that charged him with conspiring to obstruct, influence and impede an official proceeding; specifically, the federal grand jury investigation of the December 14, 2012, assault of Christopher Loeb, by agreeing to conceal James Burke's assault of Loeb.

HICKEY'S SUBSTANTIAL ASSISTANCE

James Hickey provided substantial assistance to the government in perhaps the most significant federal criminal prosecution concerning corruption in law enforcement in the history of the EDNY. As set forth in more detail below, Hickey's cooperation was singular, extraordinary, and worthy of the highest consideration from the Court.

First, Hickey's cooperation was timely. Indeed, in late October 2015, when Hickey was served with a grand jury subpoena, he immediately met with and hired an attorney, Edward Sapone, Esq., and instructed Sapone to offer his cooperation. To that end, within two weeks of being retained, Sapone proffered with the government, laying out both Hickey's obstructive conduct and detailing information that Hickey could provide about the identities and activities of his coconspirators.

Second, Hickey's cooperation was exceptional, as he provided the government with critical and previously unknown information about the identities and actions of his coconspirators, namely the various acts of obstruction of justice and witness tampering committed by Thomas Spota, Christopher McPartland and William Madigan. Certainly, prior to Hickey's cooperation, there was a strong suspicion that Spota and McPartland and others were assisting Burke cover up the assault, yet the government lacked the evidence to prove it. Hickey's detailed and damning first-hand account of Spota and McPartland's actions, which account was fully corroborated by the other witnesses and evidence uncovered during the investigation, resolved that deficiency. In other words, Hickey raised the curtain on an appalling conspiracy spearheaded by the highest-ranking law enforcement officers in Suffolk County by providing the singular evidence required to prove their guilt.

Third, while Hickey's cooperation was unprecedented and momentous, it was also protracted, grueling and laborious. Indeed, Hickey attended meeting after meeting over a four-year period during which he was required to describe and recount in excruciating detail his own wrongdoing, the many crimes and illegal activities committed by others, and, unfortunately for him, painful, embarrassing, and private details about his life, his medical condition, and his many personal failings. Nonetheless, as difficult as it was for him to face his own criminal conduct and personal shortcomings, having to testify to them, being brutally cross-examined about them, and then having them routinely appear front and center in Newsday was perhaps the greatest test of his character and mettle. Ultimately, Hickey simply told the truth and the jury believed him, just as the government did, allowing him to maintain

his dignity and sense of self-worth, after recognizing and acknowledging his personal and professional failures.

Another extraordinary aspect of Hickey's cooperation was his decision to waive his attorney/client privilege and provide his lawyer's notes to all the parties after they were the subject of a defense subpoena. The notes memorialized Hickey's detailed conversations with his attorney during which they discussed his wrongdoings and the crimes of others. Similarly, as part of his cooperation, Hickey voluntarily executed a HIPAA release, permitting the government and ultimately the defense, to obtain and review the records of his 2013 and 2015 hospitalizations. Voluntarily agreeing to release these intensely private and privileged records was courageous and unprecedented, further evidencing both Hickey's honesty and commitment to cooperation.

Then, beginning on November 26, 2019, Hickey testified for three days at the trial of United States v. McPartland and Spota, 17-CR-587 (JMA). The trial, which lasted six-weeks, ended with a jury convicting defendant Spota and defendant McPartland of all charges. Simply put, the arrest, indictment and convictions of Spota and McPartland would not have occurred without Hickey's cooperation.

Equally important for the Court's consideration is that Hickey's cooperation was both dangerous and costly to him and his family. Hickey knew better than anyone the risk of crossing the vindictive "Administration." It took enormous personal courage to cooperate knowing for certain that, at a minimum, he would be the victim of relentless personal attacks, and Spota and McPartland did not disappoint. At trial, Hickey was, at various times, painted as a lying, crazy, unstable, womanizing, alcoholic. Unfortunately, to add insult to injury, these accusations were regularly reported in the press. Indeed, the attacks by the defense were nothing short of a full-out character assassination, however, they backfired. Ultimately, the jury recognized that Hickey failings were caused, in large part, by the great burden he carried at the insistence of the defendants, powerful people who he believed he could not refuse. In other words, despite all the mud thrown at Hickey, the jury believed him. At bottom, James Hickey's cooperation was unmatched in its significance and personal risk, thus, he should be given the utmost consideration by the Court at sentencing.

Conclusion

      Accordingly, as James Hickey provided substantial assistance to the government, the government moves, pursuant to Section 5K1.1 of the United States Sentencing Guidelines, and Title 18, United States Code, Section 3553, to allow the Court in its discretion to impose a sentence below the applicable Guidelines range.

      Because of the nature of the information provided in this letter, the government respectfully requests that it be filed and remain under seal.

      Thank you very much for your consideration.

Respectfully submitted,

BREON PEACE
United States Attorney

By: *Lara Treinis Gatz*
     Lara Treinis Gatz
     Assistant U.S. Attorney

cc:    Edward Sapone, Esq. (by email)